**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

CENTER FOR FOOD SAFETY, *et al*.,

      Plaintiffs

      v.

S.M.R. JEWELL, SECRETARY OF THE
UNITED STATES DEPARTMENT OF THE
INTERIOR, *et al.*,

      Defendants

Civil Action No. 14-360 (CKK)

**MEMORANDUM OPINION**
(March 16, 2015)

      This challenge pertains to certain farming practices on five refuges that are part of the

National Wildlife Refuge System, the "largest system of lands managed primarily for wildlife

conservation in the world." AR02568. That system is managed by the Fish and Wildlife Service

("FWS" or "the Agency"), one of the defendants in this action.[1] Plaintiffs are four national

nonprofit organizations: the Center for Food Safety, Public Employees for Environmental

Responsibility, Sierra Club, and Beyond Pesticides. Plaintiffs filed this suit challenging FWS's

decisions permitting the farming of genetically modified crops and the use of various pesticides

on refuge system lands within five refuges: the Detroit Lakes Wetlands Management District, in

northwestern Minnesota; the Iowa Wetlands Management District, in north central Iowa; the

Swan Lake National Wildlife Refuge, in north central Missouri; the Crab Orchard National

Wildlife Refuge, in southern Illinois; and the Cypress Creek National Wildlife Refuge, also in

southern Illinois. Each of these refuges is within Midwest Region—Region 3—of the National

Wildlife Refuge System, which encompasses national wildlife refuges and wetland management

---

[1] The other defendants are S.M.R. Jewell, Secretary of the United States Department of the
Interior; Daniel Ashe, Director of United States Fish and Wildlife Service; and the U.S. Fish and
Wildlife Service, an Administrative Agency of the United States Department of the Interior. As
there is no need to differentiate between the defendants, the Court refers to all of them
collectively as "Defendants."

districts within Illinois, Indiana, Iowa, Michigan, Minnesota, Missouri, Ohio, and Wisconsin. AR002568.

First, Plaintiffs claim that FWS violated the National Environmental Policy Act ("NEPA") and the Administrative Procedure Act ("APA") by allowing farming on the five refuges subject to this action without NEPA analysis of the site-specific impacts of pesticide use on refuge lands. Plaintiffs challenge both the use of seeds treated with neonicotinoid pesticides, specifically, and the application of a variety of pesticides in farming activities, in general. Second, Plaintiffs claim that FWS violated NEPA and the APA by allowing the farming of genetically modified[2] crops—specifically, corn and soybeans—on refuge land within the Detroit Lakes Wetlands Management District and the Iowa Wetlands Management District. Third, Plaintiffs claim that FWS violated the National Wildlife Refuge System Administration Act of 1966 and the National Wildlife Refuge System Improvement Act of 1997, 16 U.S.C. §§ 668dd-ee (together, "Refuge Act") and their implementing regulations by failing to revise the Comprehensive Conservation Plan for the Cypress Creek National Wildlife Refuge pursuant to the statutorily-prescribed schedule. Plaintiffs seek declaratory and injunctive relief with respect to each claim. Specifically, Plaintiffs ask that the Court vacate the FWS decisions that allow pesticide use and farming of genetically modified crops at each of the five refuges until FWS prepares an adequate NEPA analysis for the respective refuges and, with respect to the Cypress Creek National Wildlife Refuge, updates the Comprehensive Conservation Plan as well.

---

[2] It appears that, for the purposes of the motions before the Court, the terms "genetically engineered crops," "genetically modified crops," and "transgenic crops" are synonymous. The Court refers to such crops as genetically modified for the sake of consistency.

Before the Court is Plaintiffs' [67] Motion for Summary Judgment and Defendants' [82] Cross-Motion for Summary Judgment. Upon consideration of the pleadings,[3] the relevant legal authorities, and the record as a whole, the Court GRANTS IN PART and DENIES IN PART Plaintiffs' [67] Motion for Summary Judgment and GRANTS IN PART and DENIES IN PART Defendants' [82] Cross-Motion for Summary Judgment. Specifically, with respect to the NEPA claims regarding the farming of genetically modified crops, the Court DENIES Plaintiffs' Motion and GRANTS Defendants' Motion with respect to the Iowa Wetland Management District, and the Court GRANTS Plaintiffs' Motion and DENIES Defendants' Motion with respect to the Detroit Lakes Wetland Management District. With respect to the NEPA claims regarding pesticide use, the Court GRANTS Plaintiffs' Motion and DENIES Defendants' Motion regarding the use of neonicotinoid pesticides at all five refuges, and the Court DENIES Plaintiffs' Motion and GRANTS Defendants' Motion regarding other pesticide use at those refuges. With respect to the Refuge Act claim regarding the updating of the Cypress Creek National Wildlife Refuge Comprehensive Conservation Plan, the Court DENIES Plaintiffs' Motion and GRANTS Defendants' Motion.

---

[3] The Court's consideration has focused on the following documents:

- Pls.' Motion for Summary Judgment ("Pls.' Mot."), ECF No. 67;
- Federal Defs.' Cross-Motion for Summary Judgment and Opp'n to Pls.' Mot. for Summary Judgment ("Defs.' Cross-Motion"), ECF No. 82;
- Brief of the Am. Farm Bureau Fed., *et al.*, as Amici Curiae in Supp. of Defs.' Mot. for Summary Judgment and in Opp'n to Pls.' Mot. for Summary Judgment ("Amici Br."), ECF No. 84-1;
- Pls.' Opp'n to Defs.' Cross-Motion and Reply in Supp. of Pls.' Mot. for Summary Judgment ("Pls.' Opp'n"), ECF No. 89; and
- Federal Defs.' Reply ("Defs.' Reply"), ECF No. 94;

In an exercise of its discretion, the Court finds that holding oral argument in this action would not be of assistance in rendering a decision. *See* LCvR 7(f).

In sum, the Court GRANTS Plaintiffs' Motion (and denies Defendants' Motion) with respect to the use of genetically modified crops at the Detroit Lakes Wetland Management District and with respect to the use of neonicotinoid pesticides but DENIES it (and grants Defendants' Motion) in all other respects.

## I. BACKGROUND

The National Wildlife Refuge system includes more than 150 million acres of public lands and waters and includes 553 national wildlife refuges and 38 wetland management districts throughout the United States. AR002566. "The mission of the System is to administer a national network of lands and waters for the conservation, management, and where appropriate, restoration of the fish, wildlife, and plant resources and their habitats within the United States for the benefit of present and future generations of Americans." 16 U.S.C. § 668dd(a)(2). "[E]ach refuge shall be managed to fulfill the mission of the System, as well as the specific purposes for which that refuge was established." *Id.* § 668dd(a)(3)(A).

Row crops have been farmed on national wildlife refuges and wetland management districts for decades to meet refuge objectives. AR002566. Frequently, those crops are farmed by private individuals—rather than by FWS directly—through cooperative agreements or special permits. *See* AR002584-85. Cooperative farming occurs on all five of the refuges challenged in this action. *See* AR0000036-40. Genetically modified corn and soybeans are currently grown on only two of the challenged refuges, the Iowa Wetland Management District and the Detroit Lakes Wetland Management District. *See id.* No pesticide can be used on the refuge system land unless it is approved by the FWS through a Pesticide Use Proposal. AR002603. Currently, a variety of

pesticides are approved for use on all five of the refuges challenged in this action.[4] AR004932-

4934 (Crab Orchard National Wildlife Refuge); AR005126-5128 (Cypress Creek National

Wildlife Refuge); AR005196-5200 (Detroit Lakes Wetland Management District); AR005247-

5249 (Iowa Wetland Management District); AR005335-5337 (Swan Lake National Wildlife

Refuge). The Refuge Act requires FWS to prepare a Comprehensive Conservation Plan for each

refuge. *See* 16 U.S.C. § 668dd(e)(1). A Comprehensive Conservation Plan is "a document that

describes the desired future conditions of a refuge or planning unit and provides long-range

guidance and management direction to achieve the purposes of the refuge." 50 C.F.R. § 25.12. A

Comprehensive Conservation Plan has been prepared for each refuge subject to this action. *See*

AR000088-1328.

## II. LEGAL STANDARD

Under Rule 56(a) of the Federal Rules of Civil Procedure, "[t]he court shall grant

summary judgment if the movant shows that there is no genuine dispute as to any material fact

and the movant is entitled to judgment as a matter of law." However, "when a party seeks review

of agency action under the APA [before a district court], the district judge sits as an appellate

tribunal. The 'entire case' on review is a question of law." *Am. Bioscience, Inc. v. Thompson,* 269

F.3d 1077, 1083 (D.C. Cir. 2001). Accordingly, "the standard set forth in Rule 56[ ] does not

apply because of the limited role of a court in reviewing the administrative record.... Summary

judgment is [ ] the mechanism for deciding whether as a matter of law the agency action is

---

[4] The record reflects that pesticides were applied in each of these five refuges as recently as 2012. *See* AR005390-5404 (enumerating actual pesticide treatments for 2012). There is no indication in the record that the application of approved pesticides has not continued since 2012, and Defendants effectively acknowledge that pesticide use continues at each of the five challenged refuges, *see* Defs.' Cross-Motion at 13-14.

supported by the administrative record and is otherwise consistent with the APA standard of review." *Southeast Conference v. Vilsack,* 684 F. Supp. 2d 135, 142 (D.D.C. 2010).

The APA "sets forth the full extent of judicial authority to review executive agency action for procedural correctness." *FCC v. Fox Television Stations, Inc.,* 556 U.S. 502, 513 (2009). It requires courts to "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "This is a 'narrow' standard of review as courts defer to the agency's expertise." *Ctr. for Food Safety v. Salazar* (*Midwest I*), 898 F. Supp. 2d 130, 138 (D.D.C. 2012) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983)). An agency is required to "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n,* 463 U.S. at 43 (internal quotation omitted). The reviewing court "is not to substitute its judgment for that of the agency." *Id.* Nevertheless, a decision that is not fully explained may be upheld "if the agency's path may reasonably be discerned." *Bowman Transp., Inc. v. Arkansas–Best Freight Sys., Inc.,* 419 U.S. 281, 286 (1974).

### III. DISCUSSION

Plaintiffs challenge the use of pesticides and the farming of genetically modified crops pursuant to the National Environmental Policy Act ("NEPA") and the Refuge Act. The Court addresses the NEPA claims followed by the Refuge Act claim.

### A. NEPA Claims
#### a. Background

NEPA "places upon an agency the obligation to consider every significant aspect of the environmental impact of a proposed action," *Baltimore Gas & Elec. Co. v. Natural Res. Def.*

*Council, Inc.,* 462 U.S. 87, 97 (1983), and "it ensures that the agency will inform the public that it has indeed considered environmental concerns in its decisionmaking process." *Id.* NEPA's requirements are "procedural," requiring "agencies to imbue their decisionmaking, through the use of certain procedures, with our country's commitment to environmental salubrity." *Citizens Against Burlington, Inc. v. Busey,* 938 F.2d 190, 193-94 (D.C. Cir. 1991). Courts may not substitute their own policy judgments for those of the agency. *See N. Slope Borough v. Andrus,* 642 F.2d 589, 599, 606 n.93 (D.C. Cir. 1980). "NEPA merely prohibits uninformed—rather than unwise—agency action." *Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 351 (1989).

NEPA requires an agency to prepare an Environmental Impact Statement for any proposed major federal action "significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). An Environmental Assessment is a "concise public document" that "[b]riefly provide[s] sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact." 40 C.F.R. § 1508.9(a). *See also id.* § 1501.4(b). If the agency determines that a full Environmental Impact Statement is not necessary—after preparing an Environmental Assessment—it must prepare a Finding of No Significant Impact explaining why the action will not have a significant impact on the environment. *Id.* §§ 1501.4(e), 1508.13; *see Flaherty v. Bryson,* 850 F. Supp. 2d 38, 45 (D.D.C. 2012); *In re Polar Bear Endangered Species Act Listing and § 4(d) Rule Litig.,* 818 F. Supp. 2d 214, 222 (D.D.C. 2011).

Because of the development and growth in the use of genetically modified crops, FWS identified, in 2010, a need to develop a consistent policy across Region 3 regarding the impacts of farming using genetically modified crops. *Midwest I*, 898 F. Supp. 2d at 135. To address

concerns about the effect of genetically modified crops on the environment, particularly the use

of genetically modified glyphosate tolerant ("GMGT") corn and soybeans,[5] FWS developed a

programmatic Environmental Assessment for Region 3. *Id.* After considering comments on the

Draft Environmental Assessment, FWS selected an alternative that combined features of the

other proposed alternatives. *See id.* at 136. Under the selected alternative, GMGT farming would

be allowed *only* for habitat restoration. *Id.* However, non-GMGT farming would be allowed as a

"management tool to achieve multiple objectives, such as, habitat management, supplemental

food for wildlife, and attracting wildlife for viewing and photography." *Id.* With the Final

Environmental Assessment, the Agency issued a Finding of No Significant Impact, concluding

that the action was not a major Federal action that would significantly impact the quality of the

human environment and that a full Environmental Impact Statement was not required. *See id.*

Several non-profit groups—including four of the five plaintiffs in this action—challenged that

conclusion, arguing that FWS violated NEPA by failing to prepare a full Environmental Impact

Statement. *See id.* at 134. In *Midwest I*, Judge James E. Boasberg, another district judge in this

district, rejected that challenge, concluding that FWS's actions were not arbitrary, capricious, an

abuse of discretion, or otherwise not in accordance with law.[6] *See id.*

Regarding the argument that FWS should have conducted a site-specific analysis of the

use of GMGT crops—with respect to their use at specific refuges—Judge Boasberg concluded

that site-specific analyses were not necessary as part of the programmatic Environmental

---

[5] GMGT crops "have been genetically modified through insertion of a gene that allows the plant to tolerate application of the herbicide glyphosate." *Midwest I*, 898 F. Supp. 2d at 135. "These crops allow[] for the effective control and elimination of noxious weeds and other undesirable plants prior to the area being reseeded or allowed to revegetate to more desirable species." *Id.* (citation omitted).

[6] In *Midwest I*, the plaintiffs also argued that FWS violated the organic acts for the National Wildlife Refuge System. *See* 898 F. Supp. 2d at 134. Judge Boasberg rejected that claim as well. *See id.* at 134, 152-53.

Assessment for Region 3. *See id.* at 150. In addition, because the complaint in that action challenged only the region-wide Environmental Assessment—not the site-specific plans developed for individual refuges—Judge Boasberg did not address the adequacy of the site-specific plans that had already been developed with respect to specific refuges. *See id*. The court noted that, in addition to the region-wide Environmental Assessment, FWS had previously conducted site-specific analysis with respect to individual refuges, creating Comprehensive Conservation Plans as required by the Refuge Act. Without explicitly determining whether those site-specific analyses were necessary for the regional Environmental Assessment to survive NEPA scrutiny, the court stated that it would "not substitute Plaintiffs' view as to the timing of the site-specific analysis for that of the expert agency." *Id.* at 150.

Plaintiffs now claim that FWS failed to provide the requisite environmental analysis before initiating the farming of genetically modified crops and the use of pesticides on the refuges challenged in this action. Plaintiffs further argue that neither the previous Region 3 Environmental Assessment nor previous conservation planning activities for specific refuges provide the site-specific environmental analysis that, Plaintiffs argue, is required for compliance with NEPA. First, the Court addresses Plaintiffs' claim regarding the farming of genetically modified crops at two of the challenged refuges. Second, the Court addresses Plaintiffs' claim about the use of seeds treated with neonicotinoid pesticides at all five refuges subject to this action. And, third, the Court addresses Plaintiffs' claim about the use of other pesticides at all five refuges subject to this action.

### b.  Genetically Modified Crops

Currently, genetically modified crops are only farmed on two refuges subject to this action, the Iowa Wetland Management District and the Detroit Lakes Wetland Management

District. *See* AR0000036-40. In the Iowa Wetland Management District, genetically modified glyphosate tolerate ("GMGT") corn and soybeans are planted on a total of 994 acres of refuge system lands. AR000039. In the Detroit Lakes Wetland Management District, GMGT corn and soybeans are planted on a total of 518 acres. AR000038. Plaintiffs argue that the FWS has never conducted site-specific environmental analysis of the farming of genetically modified crops on these specific refuges. Defendants respond that the impacts of farming GMGT crops were analyzed in the Region 3 Environmental Assessment and in previous refuge-specific NEPA analyses. Defendants also respond that Plaintiffs' challenge is barred with respect to the Detroit Lakes Wetland Management District because Plaintiffs failed to raise—through public comments addressed to the agency—the issues now being raised. *See* Defs.' Cross-Motion at 15-16.

As discussed above, another district judge considered FWS's region-wide Environmental Assessment with respect to the farming of GMGT crops in FWS's Region 3, concluding that site-specific analysis was not necessary as part of the programmatic, region-wide Environmental Assessment. *See Midwest I*, 898 F. Supp. 2d at 150. That court noted that Comprehensive Conservation Plans had been completed for individual refuges, but that the court did not evaluate whether the site-specific analysis in those plans sufficiently covered the use of GMGT crops. *See id.* However, it appears that FWS conceded in further proceedings in that action that additional site-specific analysis was necessary before GMGT crops could be introduced on refuge system lands. After the *Midwest I* Memorandum Opinion was issued, plaintiffs in that action moved for clarification, asking the court to confirm that its Memorandum Opinion did not authorize the planting of genetically modified crops on any particular refuge. *See* Pls.' Mot. for Clarification of Mem. Op., ECF No. 41, 11-cv-1934 (JEB). In response, FWS stated, "[t]he clarification is unnecessary because Plaintiffs can point to nothing in the Court's opinion that even implies that

the regional programmatic [Environmental Assessment] addresses the planting of GMGT crops

on specific refuges."[7] Defs.' Opp'n to Pls.' Mot. for Clarification of Mem. Opinion, ECF No. 42,

11-cv-1934 (JEB), at 2. In declining to clarify its opinion, the court noted that "[t]o the extent

that Plaintiffs do not challenge the substance of the [Comprehensive Conservation Plans] and

only seek confirmation that site-specific analyses are required, Defendants concede as much in

their Opposition." Order, ECF No. 44, 11-cv-1934-JEB (D.D.C. Dec. 11, 2012), at 2 (citing

Defs.' Opp'n at 2). Altogether the implication of *Midwest I*, as well as of the related filings in

that action, is that site-specific analysis of GMGT farming is necessary in order to comply with

NEPA. The Court now reviews, in turn, site-specific documents prepared regarding the Iowa

Wetland Management District and the Detroit Lakes Wetland Management District, the two

challenged refuges on which GMGT crops are planted.

For the Detroit Lakes Wetland Management District, an Environmental Assessment was

prepared jointly with a Comprehensive Conservation Plan.[8] *See* AR002178-79. On April 17,

2003, the Comprehensive Conservation Plan received final approval, and the Agency issued a

Finding of No Significant Impact with respect to the alternative for the refuge. *See* AR000841,

2178-79. Defendants argue that the 2003 Detroit Lakes Wetland Management District

Environmental Assessment contained site-specific analysis of the use of GMGT crops.[9] *See*

Defs.' Cross-Motion at 14. In support of that argument, Defendants point to only two pages

within the Environmental Assessment, as well as to the two-page Finding of No Significant

---

[7] FWS also indicated that, at that time, no refuges in the Midwest Region had yet to authorize the planting of genetically modified crops. *See* Defs.' Opp'n to Pls.' Mot. for Clarification of Mem. Opinion, ECF No. 42, 11-cv-1934 (JEB), at 2.

[8] The Environmental Assessment covered the Detroit Lakes Wetland Management District, as well as the five other Wetland Management Districts in Minnesota. AR002184-85.

[9] FWS presents similar arguments with respect to the use of pesticides, which are discussed below.

Impact itself. *See id.* None of the pages to which Defendants refer demonstrate any analysis of

the use of GMGT crops—or of any other genetically modified crops. First, Defendants point to a

section of the Environmental Assessment that actually discusses the Litchfield Wetland

Management District—not the Detroit Lakes Wetland Management District. *See* AR002233.

Moreover, while the referenced discussion of the Litchfield Wetland Management District

mentions cooperative farming, it does not mention the use of genetically modified crops, let

alone analyze the impacts of their use. Neither does the separate discussion of the Detroit Lakes

Wetland Management District elsewhere in the Environmental Assessment discuss the impacts of

farming genetically modified crops. Defendants' reliance on their second reference to the

Environmental Assessment is similarly unavailing: that reference points to a single sentence

discussing the use of farming for the purpose of habitat restoration and management; it does not,

however, reference the use of genetically modified crops for such purposes. *See* AR002245.

Beyond these specific references, the Court could not locate any discussion of farming

genetically modified crops on refuge system lands in either the Environmental Assessment or the

Comprehensive Conservation Plan.[10] The two page-Finding of No Significant Impact also has no

discussion of farming genetically modified crops. *See* AR002178-79. In sum, Defendants have

not identified any site-specific discussion of the impact of farming GMGT crops on refuge

system lands within the Detroit Lakes Wetland Management District.

Defendants in turn argue that Plaintiffs are barred from raising claims regarding site-

specific analysis of GMGT farming because they did not comment on the draft Comprehensive

---

[10] The Court notes that the Comprehensive Conservation Plan includes a single paragraph that discusses the "external threat" posed by the farming of genetically modified crops on lands "surrounding" Waterfowl Production Areas (lands within Wetland Management Districts acquired by FWS). AR000894. If anything, the brief discussion of genetically modified crops on lands other than refuge system lands, without any mention of the use of such crops on refuge system lands, suggests that genetically modified crops would *not* be used on refuge system lands.

Conservation Plan for the Detroit Lakes Wetland Management District circulated for public comment as part of the 2003 NEPA process. *See* Defs.' Cross-Motion at 16. Plaintiffs respond that they should not be barred from presenting the arguments raised in this action because they are not challenging the Detroit Lakes Wetland Management District Environmental Assessment and because the draft Comprehensive Conservation Plan would not have put them on notice that commenting regarding farming genetically modified crops was required at that time. *See* Pls.' Opp'n at 32-35. The Court agrees with Plaintiffs. Generally, parties are required to "'forcefully present [ ]' their arguments 'at the time appropriate under [agency] practice.'" *Vill. of Barrington, Ill. v. Surface Transp. Bd.*, 636 F.3d 650, 655 (D.C. Cir. 2011) (quoting *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council*, 435 U.S. 519, 554 (1978), and *United States v. L.A. Tucker Truck Lines,* 344 U.S. 33, 37 (1952)) (citations omitted). However, there was no reason for Plaintiffs to comment on the Environmental Assessment with respect to genetically modified crops. Neither the Comprehensive Conservation Plan nor the Environmental Assessment even suggested that genetically modified crops would be planted on refuge system lands. Therefore, Plaintiffs were not on notice that they should have presented their opposition to such practices at that time. Accordingly, the Court concludes that Plaintiffs' failure to comment on the 2003 Environmental Assessment and Comprehensive Conservation Plan does not bar their current claims regarding genetically modified crops.[11] Because their claims are not barred and because Defendants never conducted any site-specific analysis of the use of GMGT crops on refuge lands within the Detroit Lakes Wetland Management District, the Court grants summary judgment to Plaintiffs on the GMGT claim regarding this refuge. The Court remands this claim

---

[11] Because the Court concludes that the exhaustion doctrine does not bar Plaintiffs' claim, the Court need not consider Plaintiffs' alternative argument that an exception to the exhaustion doctrine is appropriate here.

to the agency to consider the environmental impacts of using GMGT crops on this refuge in light of this Memorandum Opinion. The Court next turns to the use of GMGT crops on refuge system lands within the Iowa Wetland Management District.

With respect to the Iowa Wetland Management District, Plaintiffs argue that FWS has not adequately analyzed the site-specific impacts of farming genetically modified crops. *See* Pls.' Mot. at 32. Defendants respond that they have conducted adequate site-specific analysis of that practice. It is necessary to evaluate the parties' claims in light of the chronology of the environmental analysis regarding this refuge. On August 19, 2013, FWS issued an Environmental Assessment and Draft Comprehensive Conservation Plan for the Iowa Wetland Management District. AR002276. Plaintiffs filed the Complaint in this action shortly thereafter. *See generally* Compl. On March 13, 2014, FWS issued a final Comprehensive Conservation Plan for the Iowa Wetland Management District together with a Finding of No Significant Impact, concluding that the selected alternative for the Iowa Wetland Management District was not a major federal action significantly affecting the quality of the human environment and, therefore, that further environmental review was not necessary. *See* Iowa Wetland Management District, Final Comprehensive Conservation Plan, App. K. ("Iowa WMD CCP"), at 274-75. The briefing in this case was filed subsequent to that action. In Plaintiffs' Complaint, Plaintiffs claimed that the draft Comprehensive Conservation Plan did not address the site-specific impacts of genetically modified crops planted on Wetland Management District lands. *See* Compl. ¶ 100. Insofar as Plaintiffs maintain this claim, it is now moot because Defendants issued the final Comprehensive Conservation Plan, which included site-specific analysis of the use of genetically modified crops. Plaintiffs argue in their motion for summary judgment, filed after the final Comprehensive Conservation Plan was issued, that the analysis in the final Comprehensive

Conservation Plan is inadequate as well. The Court disagrees.[12] In the final Comprehensive

Conservation Plan, FWS responded directly to several public comments regarding the use of

genetically modified crops on refuge system lands. *See* Iowa WMD CCP at 259, 263, 265-66,

272. The final plan included significant discussion of farming genetically modified crops that

was absent from the draft Comprehensive Conservation Plan. *See id.* at 9-19. Plaintiffs argue that

this is "too little, too late." Pls.' Mot. at 32. However, by analyzing the particular setting of the

Iowa Wetland Management District, including proper references to previous analyses done by

FWS and other agencies, FWS concluded that there were no significant effects expected from the

proposed farming of genetically modified crops on refuge system lands within this refuge.

Plaintiffs have not identified any site-specific threats particular to lands within the Iowa Wetland

Management District that require additional analysis beyond the analysis conducted by the

Agency. "An agency's decision to issue a FONSI ["Finding of No Significant Impact"]—and

therefore not to prepare an EIS—will only be overturned 'if the decision was arbitrary,

capricious, or an abuse of discretion.'" *Midwest I*, 898 F. Supp. 2d at 142-43 (quoting *Sierra

Club v. Peterson*, 717 F.2d 1409, 1413 (D.C. Cir. 1983). Regarding the use of genetically

modified crops on the Iowa Wetland Management District, the Court cannot conclude that the

decision to issue the March 2014 Finding of No Significant Impact was arbitrary, capricious, or

an abuse of discretion. Accordingly, the Court grants summary judgment to Defendants with

respect to the NEPA claim regarding farming GMGT crops at the Iowa Wetland Management

District. The Court now turns to Plaintiffs' challenges regarding the use of pesticides on the

challenged refuges.

---

[12] Although the final Comprehensive Conservation Plan is not in the designated Administrative
Record, the Court considers it because the parties reference it and because their arguments
regarding the adequacy of the site-specific analysis of the impacts on this refuge are intertwined
with the adequacy of the final Plan.

### c.  Neonicotinoid Pesticides

The Court first addresses Plaintiffs' challenge to the planting of seeds treated with neonicotinoid pesticides. As an initial matter, the record is not clear on whether such seeds are actually planted on the challenged refuges. *See* AR005458 (FWS email noting absence of pesticide use proposals for neonicotinoid seeds); AR000035 (stating requirement of pesticide use proposal for neonicotinoid seed use in 2014 and 2015). FWS is phasing out the use of these pesticides in agricultural activities, and they will no longer be used as of January 2016. *See* Defs.' Reply, Ex. 1. But the Court notes that Defendants have not claimed that these pesticides have been eliminated already. *See generally* Defs.' Reply.

Defendants did not respond, in their Cross-Motion and Opposition to Plaintiffs' Motion for Summary Judgment, to Plaintiffs' argument that FWS had not conducted any environmental analysis of the use of neonicotinoid pesticides. In their Motion, Plaintiffs' argument regarding neonicotinoid-treated seeds was framed as a separate argument—separate from their argument about pesticides generally—and yet Defendants' Cross-Motion and Opposition contains nary a mention of neonicotinoid pesticides or of the specific concerns associated with the planting of pesticide-treated seeds. Accordingly, the Court considers Defendants to have conceded this argument. In their Reply in support of their Cross-Motion for Summary Judgment, Defendants reference neonicotinoid pesticides but appear to conflate Plaintiffs' challenge to the use of pesticides *generally* with their *specific* challenge to the use of neonicotinoid pesticides, particularly neonicotinoid-treated seeds. *See, e.g.*, Defs.' Reply at 3 ("Plaintiffs' entire argument, however, is that the FWS did not comply with NEPA when authorizing the use of GMGT crops and neonicotinoid pesticides."). While Defendants argue, in their Reply, that the Agency previously conducted sufficient analysis of the use of neonicotinoid pesticides, they never mention the planting of seeds treated with such pesticides—let alone point to a place in the

16

record where the use of such seeds is analyzed. Because the Court considers Defendants to have conceded the argument regarding the planting of neonicotinoid-treated seeds—and because Defendants have not identified any portion of the record showing that FWS analyzed the impacts of planting such seeds—the Court grants Plaintiffs' motion with regard to neonicotinoid pesticides.

In terms of ordering an appropriate remedy, it is important that Defendants have stated that, by January 2016, neonicotinoid pesticides will no longer be used in the National Wildlife Refuge System as a result of a new nation-wide policy, *see id.* at 1 n.1., ex. 1. It is also important that the extent to which these pesticides are currently used is unclear from the record. Therefore, as specified in the accompanying Order, by no later than **APRIL 15, 2015**, Defendants shall file a Notice indicating the extent to which neonicotinoid pesticides are currently used on the five challenged refuges and where those pesticides are used. Assuming that these pesticides are currently used, this claim is remanded to the agency to devise a plan to phase out their use as soon as practicable, but no later than January 1, 2016. If they are not currently being used and Defendants do not contemplate their use before January 1, 2016, there is no claim remaining for the Court to resolve.

### d.  Pesticides

Next, Plaintiffs argue that FWS violated NEPA by failing to analyze the site-specific impacts of pesticide use generally—separate and apart from the failure to analyze the impact of neonicotinoid pesticides discussed above. Defendants respond that FWS addressed any site-specific impacts of pesticide use through previous site-specific NEPA documents and through the Environmental Assessment for Region 3. With respect to three of the refuges—the Cypress Creek National Wildlife Refuge, the Detroit Lakes Wetland Management District, and the Swan

Lake National Wildlife Refuge—Defendants also argue that Plaintiffs' claims are barred because they failed to raise these issues before the agency previously. The Court reviews the arguments with respect to each challenged refuge in turn.

**Detroit Lakes Wetland Management District.** Defendants argue both that they adequately considered the impacts of pesticide use within this refuge and that Plaintiffs have forfeited the opportunity to raise this claim because they failed to raise these issues before the agency. The Court disagrees with respect to the former, but agrees with Defendants with respect to the latter: FWS did not adequately consider the impact of pesticide use on the refuge, but Plaintiffs have forfeited their opportunity to bring this claim now.

As evidence of the analysis of the impact of pesticide use on this refuge, Defendants refer the Court to a brief discussion of habitat restoration and management, as well as of invasive species control, in the 2003 Detroit Lakes Wetland Management District Environmental Assessment.[13] *See* AR002245. The Environmental Assessment discusses the use of farming to restore habitat, but does not discuss the use of pesticides in that context; it also references the use of herbicides *after* land is restored to natural habitat. *Id.* In addition, the Environmental Assessment specifies that the preferred alternative would involve burning, chemical application and biological control to control invasive species. *Id.* Notwithstanding Defendants' claim to the contrary, this discussion does not analyze—let alone adequately analyze—the impact of pesticide use on this refuge. However, the Court concludes that Plaintiffs' failure to comment bars its NEPA claim. By discussing both farming and herbicide use in a section regarding habitat restoration, Plaintiffs were on notice that habitat restoration techniques could involve pesticide

---

[13] As discussed above regarding the use of genetically modified crops on this refuge, one of the two references on which Defendants rely points toward the discussion of a different refuge not challenged in this action. *See* AR002233.

use. In particular, given that the Environmental Assessment discusses the use of herbicides *after* land was restored to natural habitat and given that the Environmental Assessment discusses the use of chemical and biological control of invasive species, the question of pesticide use in farming—that is, on land not yet restored as natural habitat—was apparent from the face of the Environmental Assessment. Accordingly, in order to preserve their right to bring this action, Plaintiffs' were required to "'forcefully present [ ]' their arguments" at that time before the Agency. *Vill. of Barrington, Ill.*, 636 F.3d at 655. Because they did not do so, their NEPA claim is barred.

**Iowa Wetland Management District.** As discussed above with respect to genetically modified crops, this action was filed between the issuance of the Environmental Assessment and draft Comprehensive Conservation Plan and the issuance of the final Comprehensive Conservation Plan for this refuge. *See* AR002276; Iowa Wetland Management District, Final Comprehensive Conservation Plan. In their Complaint, Plaintiffs claimed that the draft plan did not address the site-specific impacts of genetically modified crops on Wetland Management District lands. *See* Compl. ¶ 100. Insofar as Plaintiffs maintain this claim, it is now moot because Defendants issued the final Comprehensive Conservation Plan, which included site-specific analysis of the use of pesticides. Plaintiffs argue in their motion for summary judgment, filed after the final Comprehensive Conservation Plan was issued, that the analysis in the final Comprehensive Conservation Plan is inadequate as well.[14] The Court disagrees. In the final Comprehensive Conservation Plan, FWS responded to several comments submitted in response to the draft plan regarding the use of pesticides on refuge system lands. *See id.* at 263, 267-68. The final plan also includes a significant discussion of pesticide use in agriculture that was

---

[14] The Court consider the final Comprehensive Conservation Plan even though it is not in the formal administrative record. *See supra* note 12.

absent from the draft Comprehensive Conservation Plan. *Compare id.* at 9-19 *with* AR002297-98. The Court concludes that Defendants adequately analyzed the site-specific impacts of pesticide use on this refuge. Moreover, the final Comprehensive Conservation Plan also properly relies on the Region 3 Pesticide Use Policy, which outlines the permitting process for use of specific pesticides on each refuge, as a mitigation measure. Together with the other procedures in place for pesticide use, the "agency has shown that 'safeguards in the project sufficiently reduce the impact to a minimum.'" *Midwest I*, 898 F. Supp. 2d at 150 (quoting *Michigan Gambling Opposition v. Kempthorne*, 525 F.3d 23, 29 (D.C. Cir. 2008)). Therefore, neither additional analysis nor an environmental impact statement is necessary. *See id.*

   **Crab Orchard National Wildlife Refuge.** Defendants argue that they adequately considered the environmental impacts of pesticide use on this refuge in the Environmental Impact Statement and Comprehensive Conservation Plan issued in 2006. The Court concurs. Defendants discussed the impact of pesticides in response to comments to the draft Environmental Impact Statement. *See* AR001562-63. Plaintiffs have not identified any particular *site-specific* impacts of pesticide use on this refuge that the Agency has neglected to consider. In addition, the Court recognizes that the Pesticide Use Policy that establishes a permitting process for the use of specific pesticides on each refuge mitigates the harms that result from the use of pesticides in agriculture, particularly given that the use of agriculture is limited to farming that serves the objectives of the refuge. This Court's role "is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43. It is only for the Court to determine whether the agency's judgment is "uninformed," not whether it is "unwise." *Methow Valley Citizens Council,* 490 U.S. at 351. Accordingly, the Court concludes that the agency has

adequately considered the impacts of pesticide use in permitting farming on this refuge and that the agency has complied with NEPA in doing so.

**Cypress Creek National Wildlife Refuge.** Defendants argue that they adequately considered the environmental impacts of pesticide use on this refuge and that Plaintiffs forfeited their right to bring this claim because of their failure to comment on the earlier site-specific NEPA analysis. The Court concludes that FWS adequately considered the site specific impacts of pesticide use. In the Comprehensive Management Plan for the Cypress Creek National Wildlife Refuge, issued in December 1996, FWS discussed comments that it received in response to the publicly circulated draft Comprehensive Management Plan. The Agency addressed the location and scope of farming activities, as well as the use of pesticides for those activities. AR000742-43. The Agency stated that, although continued farming use was planned, "the Refuge does not use nor does the Plan call for pesticide use for insect control." AR000743. The agency did not specifically respond regarding the use of pesticides to control unwanted vegetation. Currently, pesticides are permitted for the control of various undesirable plant species. *See, e.g.*, AR003424. It appears that FWS adequately considered impacts of pesticide use and determined that farming would continue, pesticide use would not be allowed for insect control, but that it would be allowed for control of undesirable vegetation. Given that context, it is important that, in the Region 3 Environmental Assessment regarding GMGT crops, FWS concluded that the use of herbicides will not impact wildlife if (1) they are applied following label instructions; (2) conditions in the cooperative farming agreements, including best management practices to protect soil and water, are followed; and (3) Pesticide Use Proposals are completed as required by FWS policy. AR002622. Plaintiffs have not indicated that the agency has failed to implement these conditions. Nor have they identified any site-specific impacts particular to farming

activities within the Cypress Creek National Wildlife Refuge that were not sufficiently considered in the Region 3 Environmental Assessment. Accordingly, the Court concludes that the agency has adequately considered the use of pesticides on refuge land within this refuge. Moreover, the Court considers the conditions enumerated here—as well as the more specific conditions laid out in the cooperative farming agreements, the special permits, and pesticide use proposals that permit farming and pesticide use on refuge land—as proper mitigation measures that reduce the impact of pesticide use on the refuge. Once again, the "agency has shown that 'safeguards in the project sufficiently reduce the impact to a minimum.'" *Midwest I*, 898 F. Supp. 2d at 150. Further environmental analysis, therefore, is not required.[15] *See id.*

**Swan Lake National Wildlife Refuge.** Defendants argue that environmental impacts of pesticide use were adequately analyzed and that Plaintiffs have forfeited their claim regarding this refuge by failing to comment on the previously issued NEPA documents pertaining to this refuge. In the Environmental Assessment issued for this refuge, FWS indicated that farming was ongoing. AR002679. In addition, the agency stated that its preferred alternative entailed retaining approximately 400 acres as cropland. *See also* AR001318-21 (responses to comments on draft Comprehensive Conservation Plan regarding farming). But there is no indication that FWS actually considered the implications of pesticide use associated with farming. Therefore, the Court concludes that these references do not reveal an adequate discussion of any site-specific impacts of pesticide use. However, the Court agrees that Plaintiffs have forfeited their right to

---

[15] Because the Court concludes that FWS conducted adequate analysis of the use of pesticides on this refuge, it need not reach the question of whether Plaintiffs have forfeited their ability to bring this claim now because of their failure to comment in the earlier NEPA process. However, were the Court to reach that claim, the same evidence in the record that supports the conclusion that FWS adequately analyzed the use of pesticides all the more so supports the conclusion that the issue of pesticide use was clearly presented in the 1997 NEPA analysis. Therefore, Plaintiffs' failure to comment on the use of pesticides at that time would bar Plaintiffs' challenge to the use of pesticides more than 15 years later.

bring this claim because of their failure to raise the issue before the agency. Because it was apparent from the Environmental Assessment that farming was ongoing on the refuge and alternatives proposed by the agency entailed continued farming and because it is well known that pesticide use is a common feature of conventional farming practices, Plaintiffs were on notice that they should have commented at the time of the NEPA proceedings regarding the Comprehensive Conservation Plan. Because they did not do so, they have forfeited the right to claim, now, that the agency has not adequately analyzed the environmental impacts of pesticide use associated with farming on refuge land at this refuge.

In sum, the Court grants summary judgment to Defendants with respect to the general pesticide claims—separate and apart from the claim regarding neonicotinoid pesticides—with respect to all five challenged refuges.

## B.  The Cypress Creek National Wildlife Refuge Comprehensive Conservation Plan

The Refuge Act requires that a Comprehensive Conservation Plan be in place for each National Wildlife Refuge within 15 years after the passage of the National Wildlife Refuge System Improvement Act of 1997. 16 U.S.C. § 668dd(e)(1)(B). It also requires that FWS must "revise the conservation plan as may be necessary" within "15 years after the date of issuance of a conservation plan." *Id.* § 668dd(e)(1)(A)(iv). The most recent plan for the Cypress Creek National Wildlife Refuge was approved on April 14, 1997, AR000633, and the fifteen year period beginning on that date ended in April 2012.[16] Plaintiffs argue that FWS has unreasonably delayed the revision of this plan. Plaintiffs ask the Court, in response, to vacate all of the

---

[16] The 1997 plan for Cypress Creek National Wildlife Refuge was titled a Comprehensive Management Plan. AR000633. The title "Comprehensive Management Plan" reflected the pre-1997 statutory scheme, but the Agency determined at that time that the plan qualified as a Comprehensive Conservation Plan for the purposes of the Refuge Act. *See* AR002164. Plaintiffs do not argue otherwise.

cooperative farming agreements on this refuge until FWS prepares a current Comprehensive

Conservation Plan. *See* Pls.' Mot. at 44. Notably, they do not seek to compel FWS to update the

plan. *See id.* Defendants respond that the revision of the Comprehensive Conservation Plan is not

unreasonably delayed.

"Resolution of a claim of unreasonable delay is ordinarily a complicated and nuanced

task requiring consideration of the particular facts and circumstances before the court." *Mashpee*

*Wampanoag Tribal Council, Inc. v. Norton*, 336 F.3d 1094, 1100 (D.C. Cir. 2003). In

*Telecommunications Research & Action Ctr. v. F.C.C.* ("*TRAC*"), 750 F.2d 70 (D.C. Cir. 1984),

the D.C. Circuit Court of Appeals set out a six-factor standard for assessing unreasonable delay

claims, which entails considering the following factors:

> (1) the time agencies take to make decisions must be governed by a "rule of
> reason[;]" (2) where Congress has provided a timetable or other indication of the
> speed with which it expects the agency to proceed in the enabling statute, that
> statutory scheme may supply content for this rule of reason; (3) delays that might
> be reasonable in the sphere of economic regulation are less tolerable when human
> health and welfare are at stake; (4) the court should consider the effect of
> expediting delayed action on agency activities of a higher or competing priority;
> (5) the court should also take into account the nature and extent of the interests
> prejudiced by delay; and (6) the court need not "find any impropriety lurking
> behind agency lassitude in order to hold that agency action is 'unreasonably
> delayed.' "

*Id.* at 80 (citations omitted). The Court analyzes these factors in turn.

It is undisputed that FWS has not updated the Cypress Creek Comprehensive

Conservation Plan within the 15-year period set out by statute. The Court assumes that the 15-

year deadline "indeed supplies content for item one's 'rule of reason.'" *In re Barr Labs., Inc.*,

930 F.2d 72, 75 (D.C. Cir. 1991). "[B]ut a finding that delay is unreasonable does not, alone,

justify judicial intervention." *Id.* The parties disagree about the applicability of the third and fifth

factors. While Plaintiffs argue that the delay in updating the Comprehensive Conservation Plan

has left the "environmental and health impacts of farming and pesticide use unexamined," Pls.'

Mot. at 42, Defendants argue that FWS officials had, in fact, already examined those impacts.
The Court agrees with Defendants. Specifically, in April 2011, FWS issued a Compatibility
Determination, which concluded that certain farming activities were compatible with the
objectives of the refuge and therefore allowed minimal herbicide use. *See* AR00044-47. This is
not a case where an agency has delayed all analysis of certain risks. Nor is this a case where, if
the agency were to engage in the delayed action, any particular substantive outcome would be
guaranteed; it would only guarantee that the analysis would be done. Finally, with respect to the
sixth factor, Defendants note, and Plaintiffs do not contest, that there is no claim of any
impropriety behind the agency's failure to update the Comprehensive Conservation Plan within
the statutorily mandated deadline. Based on these factors, the Court concludes that the agency's
delay in revising the Comprehensive Conservation Plan for this refuge is not one that warrants
the Court's intervention.

  Moreover, even assuming that there had been an unreasonable delay with respect to the
revision of the Comprehensive Conservation Plan—contrary to the Court's conclusion above—
the remedy Plaintiffs seek is not viable. Plaintiffs do not ask the Court to "compel agency action
unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). Instead, they ask the Court to
set aside all of the cooperative farming agreements currently in place at the Cypress Creek
National Wildlife Refuge until such point that the Comprehensive Conservation Plan is updated.
However, Plaintiffs have provided no basis for the Court to conclude that an unreasonably
delayed plan should require an immediate cessation of cooperative farming at the refuge. It
would be purely speculative for the Court to conclude that a revised Comprehensive
Conservation Plan would eliminate farming or farm-related pesticide use at the refuge. The D.C.
Circuit Court of Appeals has framed the unreasonable delay analysis as a determination of the

appropriateness of mandamus requiring an agency to take the delayed or withheld action. *See Telecommunications Research & Action Ctr. v. F.C.C.*, 750 F.2d 70, 79 (D.C. Cir. 1984) ("In the context of a claim of unreasonable delay, the first stage of judicial inquiry is to consider whether the agency's delay is so egregious as to warrant mandamus."). Plaintiffs have not identified any authority to support using a claim of unreasonable delay to require the agency to take actions not directly linked to the delayed action or to otherwise punish the agency for the delay. Accordingly, even if the *TRAC* factors indicated that the revision of the Comprehensive Conservation Plan were unreasonably delayed, the Court would conclude that such a delay is not properly the basis for setting aside existing cooperative farming agreements. With respect to the Refuge Act claim, the Court grants summary judgment to Defendants.

## IV. CONCLUSION

For the foregoing reasons, Plaintiffs' [67] Motion for Summary Judgment is GRANTED IN PART and DENIED IN PART and Defendants' [82] Cross-Motion for Summary Judgment is GRANTED IN PART and DENIED IN PART.

Specifically, with respect to the NEPA claims regarding the farming of genetically modified crops, the Court DENIES Plaintiffs' Motion and GRANTS Defendants' Motion with respect to the Iowa Wetland Management District, and the Court GRANTS Plaintiffs' Motion and DENIES Defendants' Motion with respect to the Detroit Lakes Wetland Management District. With respect to the Detroit Lakes Wetland Management District, this claim is remanded to the agency to consider the environmental impact of using genetically modified crops on this refuge in light of this Memorandum Opinion.

With respect to the NEPA claim regarding pesticide use, the Court GRANTS Plaintiffs' Motion and DENIES Defendants' Motion regarding the use of neonicotinoid pesticides at all five

refuges and DENIES Plaintiffs' Motion, and the Court GRANTS Defendants' Motion regarding other pesticide use at those refuges. By no later than APRIL 15, 2015, Defendants shall file a Notice indicating the extent to which neonicotinoid pesticides are currently used on the five challenged refuges and where those pesticides are used. Assuming that these pesticides are currently used—or Defendants plan for them to be used—this claim is remanded to the agency to devise a plan to phase out their use as soon as practicable, but no later than January 1, 2016. If they are not currently being used and Defendants do not contemplate their use before January 1, 2016, there is no claim remaining for the Court to resolve.

With respect to the Refuge Act claim regarding the revision of the Cypress Creek National Wildlife Refuge Comprehensive Conservation Plan, the Court DENIES Plaintiffs' Motion and GRANTS Defendants' Motion.

An appropriate Order accompanies this Memorandum Opinion.

Dated: March 16, 2015

_____/s/_____
COLLEEN KOLLAR-KOTELLY
United States District Judge